## In re COMMUNITY CHURCHES OF AMERICA, Debtors.

## In re CONCORD SENIOR HOUSING FOUNDATION, Debtors.

### Bankruptcy Nos. 85–00405, 85–00494.

United States Bankruptcy Court, District of Columbia.

Jan. 27, 1986.

Michael J. Farrell, Los Angeles, Cal., U.S. Trustee for C.D. of Cal.

William C. White, Alexandria, Va., U.S. Trustee for Dist. of Col.

Christ Troupis, Washington, D.C., for Movants.

Samuel Rothman, Washington, D.C., for HUD.

Phillip McNutt, Bethesda, Md., for debtors.

## OPINION AND ORDER

GEORGE FRANCIS BASON, Jr., Bankruptcy Judge.

Following a hearing held on November 12, 1985 this Court, albeit reluctantly and with serious reservations, provisionally denied a motion by Walter Kendall *et al.* ("the Movants")[1] to transfer these two related cases immediately to the bankruptcy court in California having proper venue. This Court's oral ruling provisionally denying the motion at that time was based largely upon the recommendation of the U.S. Trustee, whose recommendation was in turn based largely upon representations by the Debtors concerning an offer to purchase what the Debtors have stated is the sole significant tangible asset of either Debtor. That asset is the "Concord" housing facility for the elderly located in Pasadena, California. The Debtors' counsel created the impression by his representations at the November 12, 1985 hearing that the proposed sale (1) could (and, in order to satisfy the prospective purchaser, would have to be) completed by December 31, 1985, (2) would satisfy all the legitimate concerns of the Movants, (3) would result in prompt, 100% payment to the Movants and other creditors, (4) would benefit the low-income, elderly occupants of the Concord by assuring their continued occupancy at low rents, pursuant to the commitment made to the U.S. Department of Housing and Urban Development ("HUD") when HUD financing was first obtained for the project, and (5) would satisfy HUD's concerns (HUD's approval being necessary before the proposed sale could go through).

Subsequently, on November 15, 1985, this Court signed a written order submitted by the U.S. Trustee pursuant to the Court's oral ruling. The Debtors have complied with the literal language of that written Order in every respect save one: they were one day late in sending out notice of the disclosure statement hearing, notwithstanding the explicit, handwritten commands added to the Order by the undersigned Judge that their compliance with all conditions of the Order must be "timely" and that "Time is of the essence." The Debtors have sought to excuse their noncompliance on the basis of an apparent breakdown of communication between their counsel and this Court's Clerk's Office. In view of the factors set forth below, this Court, in now ordering these cases transferred, will not rely solely or even substantially upon the Debtors' untimeliness.

Rather, this Order transferring these cases to California is based largely upon the original reasons which prompted this Court in the first instance to be extremely reluctant to retain the cases here at all, even for the brief period posited by the Debtors' counsel. (That brief period—until December 31, 1985—has in any event now expired.)

The facts are: (a) the real property at issue is located in California; (b) most of the Debtors' principals reside in California; (c) HUD's regional office, which must first pass on any proposed sale of the real property, is located in California; (d) most of the Debtors' creditors are located in California, and hardly any creditors have been shown to be located in or near the District of Columbia; (e) the proposed purchaser is

---

**1.** The Movants are judgment creditors holding claims in excess of $1.5 million.

located in California; and (f) neither Debtor has any significant contact with or assets in the District of Columbia.[2] As this Court observed at the hearing on November 12, 1985 and noted again in its written Order of November 15, 1985, it appears that these Debtors, by filing their petitions in this District, were seeking a forum removed as far as possible from their creditors. That is precisely opposite to the intention of the venue statutes. 28 U.S.C. §§ 1408 and 1412; see *Barnes v. Whelan*, 689 F.2d 193 (D.C.Cir.1982).

In addition, at the December 13, 1985 disclosure statement hearing it became painfully obvious that every one of the impressions created by the Debtors' counsel at the November 12, 1985 hearing, by which he obtained the temporary retention of these cases here, was completely false. Indeed, the representations and predictions made on November 12 were so far from reality as to create a strong impression that these Debtors, and perhaps others acting in concert with them, have deliberately abused the judicial process (see Bankruptcy Rule 9011) and sought to perpetrate a fraud not only upon their creditors but also upon the courts.[3]

(1) Contrary to the impression created on November 12, 1985, the proposed sale obviously could not be completed by December 31, 1985. Among many other reasons, the proposed purchaser is not a non-profit organization, as required by HUD, whose consent is essential. Indeed, HUD's basic statutory authority prohibits HUD from approving such a sale. See paragraph 5 below.

(2) Contrary to the representation on November 12 that all of the Movants' legitimate concerns would be satisfied, the Movants' written Objection to Confirmation, filed on December 6, 1985 ("Movants' Objection"), sets out numerous concerns about the proposed sale and plan which appear to this Court to be not only legitimate but very substantial and probably determinative.[4] Those concerns include the plan's preferential treatment of insiders, its lack of feasibility, its unfairness to the housing facility's tenants, and the proposed purchaser's prior criminal conviction for conspiracy to defraud and defrauding HUD in "a large-scale kickback scheme."[5]

(3) Contrary to the impression created on November 12, instead of paying all creditors 100% promptly, the plan filed less than a week later proposes to defer the bulk of payments for up to 15 years.[6] As the Movants' counsel has pointed out, "Most of these creditors are senior citizens and many are in poor health."[7] Robert Grant, who has identified himself as a major creditor, made the same point as follows in a letter to this Court: "Many of the creditors will not be around in future years to make use of their funds. They are elderly and many are in very poor health."[8] Grant's

---

**2.** The Court is aware that, technically at least, venue is proper in this District, because a corporation named Community Churches of America, following previous difficulties with creditors, went out of existence as a California corporation, and a new District of Columbia corporation having exactly the same name was then incorporated; and hence that corporation is "domiciled" here; and because Concord Senior Housing Foundation is an "affiliate" of Community Churches of America. See 11 U.S.C. § 101(2); 28 U.S.C. § 1408. This Court, of course, has the authority and the duty to look beyond such a gossamer connection, and to transfer a case "in the interest of justice or for the convenience of the parties." 28 U.S.C. § 1412. See *In re Leonard*, 55 B.R. 106, 13 B.C.D. 1003 (Bnkr.D.C.1985).

**3.** No decision on that issue is necessary, and none is made, in connection with this Order transferring venue.

**4.** This Court of course makes no decision at this time on any issue other than whether to transfer these cases.

**5.** So described in a newspaper article attached as an exhibit to the Movants' Objection.

**6.** In addition, as set forth in the next paragraph, even that promise may be illusory.

**7.** Movant's Objection, p. 2.

**8.** Letter, Robert Grant to the undersigned Judge, filed on December 9, 1985.

Grant's involvement in these cases may merit close scrutiny. Page 5 of the Movants' Objec-

letter sought to convince this Court of the urgency of approving the proposed sale before December 31, 1985. It appears that either Grant was ignorant of the Plan's true provisions (calling for lengthy deferral of the bulk of payments), or else he deliberately sought to mislead this Court, as well as creditors.

(4) Contrary to the November 12 promise of benefit to the housing facility's low-income occupants, both the Movants and HUD have pointed out that under the November 18 Plan it will be impossible for the proposed purchaser to maintain the cash flow needed to make the projected payments over the next 15 years without substantially increasing rents (or else obtaining HUD subsidies which HUD is not willing to provide). Movants' Objection, p. 7; [HUD] Secretary's Objections to Sale of Concord Senior Housing Facility Disclosure Statement and Consolidated Plan of reorganization ("HUD's Objections"), filed on December 11, 1985, pp. 4–6.

(5) Contrary to the representations on November 12 that HUD's concerns would be satisfied, HUD's concerns have not been and cannot be satisfied. In the nature of things, HUD's non-financial concerns can never be satisfied by this proposed sale. As HUD points out, its basic statutory authority prohibits it from approving a sale to someone other than a non-profit entity.

12 U.S.C. § 1701q(a)(1).[9] HUD's Objections also point out that the proposed plan is financially unsound (pp. 4–6) and that these Debtors' activities over a long period of time present substantial questions of lack of good faith (see pp. 1–4), including lack of good faith both as to the plan itself (pp. 8–9) and lack of good faith as to the Debtor Community Church's "transcontinental move for no apparently legitimate purpose" (p. 9).

In a Supplemental Declaration in Support of Motion for Transfer of Venue, filed on October 4, 1985 ("Supplemental Declaration"), the Movant's counsel points out that a closely related entity has recently filed a bankruptcy petition in the Bankruptcy Court to which this Court is hereby transferring these cases. *California Graduate School of Theology,* Case No. LA85–11400–JD. That fact provides another strong reason for transfer. That Supplemental Declaration, the Movants' original motion, the Movant's Objection, and HUD's Objections all contain additional, documented information, unrebutted by these Debtors, which suggests that these Debtors and their principals may for years have engaged in fraudulent transfers of a number of properties and also have solicited funds from investors on the basis that those funds would be used to help the poor and the elderly, and then have kept substantial por-

---

tion recites various connections between Grant and these Debtors and their principals. Grant is also a member of the Unsecured Creditors' Committees of both Debtors, represented on those Committees by Greg Dixon. See U.S. Trustee's Appointments of Unsecured Creditors' Committees, filed August 5, 1985 in Case No. 85–00405 and September 19, 1985 in Case No. 85–00494. Membership in a creditors' committee of course carries with it fiduciary obligations to all creditors represented by the committee (in these cases, all general unsecured creditors).

Grant wrote a four-page, single-spaced letter to a number of creditors. The fourth page strongly implied that these creditors' support of the Debtors' proposed plan would result in their "get[ting their] money back, and soon." He said: "I do not know about you, but I really need to get my money back, and soon."

Grant's letter concludes: "If you wish for me to speak on your behalf with the judge in Washington, D.C., who is in charge of this case, please drop me a note in the enclosed, self-addressed, stamped envelope." Grant neither sought nor obtained this Court's approval for this written solicitation of creditors' support for the Debtors' plan. See 11 U.S.C. § 1125. As noted above, Grant's solicitation letter includes the false implication that the plan will result in prompt, full payment. (This Court has seen only the fourth and last page of the letter, and that only because some of the creditors wrote their responses on page 4. Hence, the Court does not know whether Grant's solicitation letter contains other false implications or statements as well.)

9. HUD's Objections, p. 7.

tions of those funds for their own private benefit.[10]

Fraudulent schemes are always reprehensible. When carried out under a cloak of piety, using God's name,[11] they are morally repulsive and utterly contemptible.

NOW THEREFORE IT IS ORDERED that these cases be and they hereby are transferred to the United States Bankruptcy Court for the Central District of California; and it is further

ORDERED that this Court expressly declines to rule upon (a) these Debtors' applications for authority to employ counsel or (b) their Disclosure Statement, leaving those matters for decision by the transferee Court.

In view of the serious, documented allegations concerning fraudulent transfers of assets by these Debtors and their principals, this Court strongly urges the creditors of these Debtors and the United States Trustee for the Central District of California to consider the advisability of asking for the appointment of a trustee in these cases, pursuant to 11 U.S.C. § 1104.

---

**10.** No decision on these issues is necessary, and none made, in connection with this Order transferring venue.

As to private benefit, see, *e.g.,* pp. 4–5 of HUD's Objections: "... the Concord has accumulated in excess of $370,000 from operations and currently has a net monthly income of approximately $14,500 (Schedule C), an anomalous situation for a non-profit owner."

As to fraudulent transfers, see, *e.g.,* Supplemental Declaration, which refers in ¶ 4 to successive "gift" (and hence fraudulent) transfers of the personal residence of Community Churches' president to different entities.

**11.** "Thou shalt not take the name of the Lord thy God in vain." Exodus 19:7. See also Matthew 23:14 and 27–28.

See p. 4 of Robert Grant's letter to creditors soliciting their support for the Debtors' plan: "I felt in the courtroom [on November 12, 1985 when this Court provisionally denied the motion to transfer venue] that God had worked a miracle on our behalf." See Movants' Objection, p. 5, as to Grant's close connections to these Debtors and their principals. See also footnote 8 above, concerning Grant's fiduciary duties to creditors and the false representation implicit in his letter to them.